IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

_____

UNITED STATES OF AMERICA,

        Plaintiff,

                               Civil No. _____

    v.

HOMECA RECYCLING CENTER CO. INC.,        **COMPLAINT**

        Defendants.

_____

The United States of America, by the authority of the Attorney General, through the undersigned attorneys, acting at the request of the U.S. Environmental Protection Agency ("EPA"), files this complaint and alleges as follows:

## INTRODUCTION

1.      This is an action for civil penalties against Homeca Recycling Center Co., Inc. ("Homeca") under Section 3008(a) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6928(a), Section 113(b)(2) of the Clean Water Act ("CWA"), 42 U.S.C. § 1319(d), and Section 113(b)(2) of the Clean Air Act ("CAA"), 42 U.S.C. § 7413(b)(2). Homeca operates three scrap metal recycling facilities located in Caguas, Playa Ponce, and Hormigueros, Puerto Rico. The violations relate to Homeca's mismanagement of and disposal onto land of hazardous wastes and used oil; mismanagement of and releases into the atmosphere of refrigerants from automobile air conditioning systems; and unpermitted discharges into waters of the United States of storm water from industrial activities.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action and the parties under Section 3008(a) of RCRA, 42 U.S.C. § 6928(a); Section 309(b) of the CWA, 33 U.S.C.

§ 1319(b); Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and 28 U.S.C. §§ 1331, 1345, and 1355.

3.    Venue is proper in this judicial district because the facilities are located, and the alleged violations occurred, in this judicial district. 28 U.S.C. §§ 1391 and 1395; 42 U.S.C. § 6928(a); 33 U.S.C. § 1319(b); 42 U.S.C. § 7413(b).

## THE DEFENDANT

4.    Homeca is a corporation organized under the laws of the Commonwealth of Puerto Rico.

5.    Homeca is the "operator," as defined in 40 C.F.R. § 260.10, of automobile salvage, scrap recycling and demolition facilities in three locations in Puerto Rico: at Carr. PR 183, km 4.5, Barrio Tomas de Castro in Caguas; at Calle Comercio 1 in Playa Ponce; and at PR-309 km 1.4 in Hormigueros.

6.    Homeca is the "owner," as defined in 40 C.F.R. § 260.10, of the Caguas and Hormigueros facilities.

7.    Homeca is a "person" within the meaning of Section 1004(15) of RCRA, 42 U.S.C. § 6902(15), Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and Section 302(e) of the CAA, 42 U.S.C. § 7602(e).

## NOTICE

8.    In compliance with Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and Section 113(b) of the CAA, 42 U.S.C. § 7413(b), notice of the commencement of this action has been given to the Puerto Rico Environmental Quality Board ("EQB"), the appropriate pollution control agency in the Commonwealth.

**STATUTORY AND REGULATORY BACKGROUND**

**Resource Conservation and Recovery Act**

9.      Subtitle C of RCRA establishes a comprehensive program for regulating the management of hazardous waste and used oil. 42 U.S.C. §§ 6921 to 6939.

10.     Sections 3002(a), 3004(a), and 3005 of RCRA, 42 U.S.C. §§ 6922(a), 6924(a), and 6925, direct EPA to promulgate regulations governing the generation and management of hazardous waste. These regulations, found at 40 C.F.R. Parts 260 through 270, apply to hazardous waste generators, transporters, and treatment, storage and disposal facilities. These regulations require, among other things, that hazardous wastes be properly identified, safely managed, and/or otherwise properly treated, stored or disposed of at authorized facilities.

11.     Section 3014 of RCRA, 42 U.S.C. § 6935, directs EPA to promulgate regulations governing the management of used oil. These regulations are set forth in 40 C.F.R. Part 279.

12.     **Requirement to Make a Hazardous Waste Determination**. Under 40 C.F.R. § 262.11, a person who generates "solid waste," as defined in 40 C.F.R. § 261.2, must determine if the solid waste is a hazardous waste. Subject to certain inapplicable exclusions, a solid waste is any discarded material. 40 C.F.R. § 261.2. A discarded material is, among other things, any material that is "abandoned," as that term is defined in 40 C.F.R. § 261.2(b), which includes material "abandoned by being disposed of … or accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned, or incinerated." 40 C.F.R. § 261.2(b)(3). The criteria for identifying hazardous wastes are set forth in 40 C.F.R. Part 261. A solid waste is a hazardous waste if it is not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b) and it exhibits any of the characteristics of hazardous waste identified in Subpart C of 40 C.F.R. Part 261, or it is listed in Subpart D of 40 C.F.R. Part 261.

3

Characteristic hazardous wastes are assigned "D" codes in 40 C.F.R. Part 261, Subpart C depending on the specific hazardous characteristic that the waste exhibits.

13.   **Prohibition Against Disposal of Hazardous Waste at Unauthorized Facilities**. Section 3005 of RCRA, 42 U.S.C. § 6925 and 40 C.F.R. § 270.1(c), prohibits the "disposal" of hazardous waste except at facilities with interim status or at facilities that have a RCRA hazardous waste permit authorizing such disposal. "Disposal" is defined in 40 C.F.R. § 260.10 as the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

14.   **Requirement to Minimize Risk**. Owners and operators of hazardous waste facilities must maintain and operate these facilities to minimize "the possibility of a fire, explosion, or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment." 40 C.F.R. §§ 264.30 and 264.31.

15.   **Prohibition Against Illegal Disposal of Used Oil**. As defined in 40 C.F.R. § 279.1, "used oil is any oil that has been refined from crude oil, or any synthetic oil, that has been used and as a result of such use is contaminated by physical or chemical impurities." Subpart I of 40 C.F.R. Part 279 sets forth the standards for the disposal of used oils that are not being recycled and are being disposed. Pursuant to 40 C.F.R. § 279.81(a), used oils that are not recycled and are identified as hazardous waste must be managed and disposed of in accordance with hazardous waste requirements set forth in 40 C.F.R. Parts 260-266, 268 and 270. Pursuant

to 40 C.F.R. § 279.81(b), used oils that do not constitute hazardous waste must be disposed under the requirements of 40 C.F.R. Parts 257 and 258.

16.    **Requirement to Properly Label Used Oil Containers**. Used oil generators are subject to Subpart C of 40 C.F.R. Part 279. 40 C.F.R. § 279.20. Used oil generators must store used oil in containers clearly marked with the words "Used Oil." 40 C.F.R. § 279.22(c). A "used oil generator" is defined in 40 C.F.R. § 279.1 as "any person, by site, whose act or process produces used oil or whose act first causes used oil to become subject to regulation."

17.    **Requirement to Clean Up and Properly Manage Released Used Oil**. Used oil generators must respond to releases of used oil. 40 C.F.R. § 279.22(d). Upon the detection of a release of used oil into the environment, other than a release from an underground storage tank system, used oil generators must: (a) stop the release; (b) contain the released used oil; and (c) clean up and properly manage the released used oil and other materials.

## Clean Water Act

18.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the "discharge of any pollutant" by any person into navigable waters except in compliance with, among other things, a permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.

19.    "Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

20.    "Pollutant" means, among other things, solid waste, chemical wastes, biological material, and industrial waste. 33 U.S.C. § 1362(6).

21.    "Navigable waters" means "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

5

22.    "Waters of the United States" includes, *inter alia*, all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce. 40 C.F.R. § 122.2

23.    A "point source" includes "any discernible, confined and discrete conveyance … from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

24.    Section 402(a) of the CWA, 33 U.S.C. § 1342(a), authorizes EPA to issue permits for the discharge of pollutants into navigable waters in compliance with the CWA.

25.    Section 402 of the CWA, 33 U.S.C. § 1342, directs EPA to issue regulations regarding the control of storm water discharges.  Such regulations are found at 40 C.F.R. § 122.26.

26.    A permit issued under the CWA is required for a "storm water discharge associated with industrial activity." 33 U.S.C. § 1342(p)(2)(B); 40 C.F.R. § 122.26.

27.    Dischargers of storm water associated with industrial activity must apply for an individual permit, apply for a permit through a group application, or seek coverage under a general permit prior to discharging storm water. 40 C.F.R. §§ 122.26(a)(1)(ii), (b)(14) and 122.26(c)(1).

28.    Facilities that are classified under Standard Industrial Classification (SIC) codes 5015 and 5093, which includes facilities involved in the recycling of materials, scrapyards, battery reclaimers, salvage yards and automobile junkyards, are considered industrial activities that must obtain storm water permit authorization. 40 C.F.R. § 122.26(b)(14)(iv).

6

**The Multi-Sector General Permit**

29.     EPA issued a National Pollutant Discharge Elimination System ("NPDES") Storm Water Multi-Sector General Permit for Industrial Activities in September 1995 ("1995 MSGP"). EPA re-issued the MSGP on October 30, 2000 ("2000 MSGP"). 65 Fed. Reg. 64746.

30.     In order to obtain coverage under the 2000 MSGP, a facility must submit a Notice of Intent ("NOI"), prepare and implement a Storm Water Pollution Prevention Plan ("SWPPP"), conduct inspections, conduct monitoring and sampling, and meet other eligibility requirements.

31.     Automobile salvage yards and scrap recycling and waste recycling facilities fall under the "Sector M" and "Sector N" coverage requirements of the 2000 MSGP.

32.     Under the 2000 MSGP, permit coverage became effective two days after submission of a complete NOI.

33.     The 2000 MSGP expired on October 30, 2005. Facilities that did not have coverage under the 2000 MSGP by October 30, 2005 could not obtain coverage until a new MSGP became effective.

34.     EPA re-issued the MSGP on September 29, 2008 ("2008 MSGP"). 73 Fed. Reg. 56572.

35.     Dischargers with coverage under the 2000 MSGP were required to submit an NOI for coverage under the 2008 MSGP by January 5, 2009. Table 1-2, 2008 MSGP.

36.     Dischargers in operation prior to October 30, 2005 that were not covered under the 2000 MSGP or other NPDES permit were required to file NOIs "immediately" in order to obtain coverage under the 2008 MSGP. Table 1-2, 2008 MSGP.

37.     Under the 2008 MSGP, permit coverage for dischargers in operation prior to October 30, 2005, but not covered under the 2000 MSGP or another NPDES permit, became effective two days after submission of a complete NOI.

**Clean Air Act**

38.     Title VI of the CAA, 42 U.S.C. § 7671 was enacted by Congress in 1990 to reduce the amount of class I and class II ozone-depleting substances and pure substitutes (refrigerants) released into the environment.

39.     Pursuant to Section 608(b) of the CAA, 42 U.S.C. § 767lg(b), EPA promulgated Subpart F, the Recycling and Emissions Reduction regulations. Subpart F is found at 40 C.F.R. §§ 82.150 to 82.166.

40.     The purpose of Subpart F is to "reduce emissions of class I and class II refrigerants to the lowest achievable level … during the service, maintenance, repair, and disposal of appliances."  40 C.F.R. § 82.150(a).  An "appliance" is any device which contains and uses a class I or class II substance as a refrigerant and which is used for household or commercial purposes, including any air conditioner, refrigerator, chiller, or freezer.  40 C.F.R. § 82.152.  Class I and II substances include refrigerants containing chlorofluorocarbons ("CFCs") and hydro-chlorofluorocarbons ("HCFCs").

41.     Pursuant to 40 C.F.R. § 82.152, the term "disposal" includes "the process leading to and including" the following:

> a.      The discharge, deposit, dumping, or placing of any discarded appliance into or on any land or water;
>
> b.      The disassembly of any appliance for discharge, deposit, dumping or placing of its discarded component parts into or on any land or water; or
>
> c.      The disassembly of any appliance for reuse of its component parts.

8

42.     Persons, including scrap recyclers and landfill operators, taking the final step in the disposal process of a small appliance, room air conditioner, or motor vehicle air conditioner ("MVAC") must either: (a) recover any remaining refrigerant from the appliance; or (b) verify that the refrigerant has been evacuated from the appliance previously. 40 C.F.R. § 82.156(f).

43.     Verification of recovery under 40 C.F.R. § 82.l56(f) requires obtaining a signed statement from the person from whom the appliance is obtained that all refrigerant that had not leaked previously has been recovered from the appliance.

44.     Persons disposing of small appliances and MVACs also must maintain on-site, for at least three years, copies of the signed statements that they obtained. 40 C.F.R. § 82.166(i); 40 C.F.R. § 82.166(m).

### Enforcement Authorities

### RCRA

45.     Section 3008(a) of RCRA, 42 U.S.C. § 6928(a), authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction to enforce the provisions of Subtitle C of RCRA and/or any regulations promulgated thereunder.

46.     Under Section 3008(g) of RCRA, 42 U.S.C. § 6928(g), any person who violates any requirement of Subtitle C of RCRA, including any regulation promulgated thereunder, shall be liable for a civil penalty of up to $25,000 for each day of each violation.

### CWA

47.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, when any person is in violation of 33 U.S.C. §§ 1311, 1318, or any permit issued pursuant to Section 402 of the CWA, 33 U.S.C. 1342.

9

48.     Under Section 309(d) of the CWA, 33 U.S.C. § 1319(d), any person who violates 33 U.S.C. §§ 1311, 1318, or any permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342, shall be liable for civil penalties of up to $25,000 for each day of each violation.

### CAA

49.     Section 113(b)(2) of the CAA, 42 U.S.C. § 7413(b)(2), authorizes EPA to commence a civil action for a permanent or temporary injunction or to recover civil penalties of up to $25,000 per violation per day, for any violations of, among other things, Subchapter VI of the CAA or of any rule promulgated under the CAA.

50.     **Civil Penalty Inflation Adjustment**. The maximum daily civil penalty amounts under Section 3008(g) of RCRA, Section 309(b) of the CWA, and Section 113(b)(2) the CAA are increased to $32,500 for violations occurring between March 15, 2004 and January 12, 2009, and to $37,500 for violations occurring between January 12, 2009 and November 2, 2015. 28 U.S.C. § 2461; 31 U.S.C. § 3701; 40 C.F.R. Part 19; 69 Fed. Reg. 7,121 (Feb. 13, 2004).

### GENERAL ALLEGATIONS

51.     At its three facilities Homeca receives and crushes vehicles and white goods such as refrigerators, air conditioning units, and other small appliances. The crushed vehicles and white goods are bailed, stored, and then shipped to metal refineries.

52.     During the relevant time period, at each facility, Homeca conducted the crushing, bailing and storage operations in the open air and directly on bare ground.

53.     The operations at the three facilities are industrial activities classified under SIC codes 5015 and 5093.

54.     **EPA Inspections**. EPA inspected the Caguas facility on April 24, 2008, March 31, 2011, and June 3, 2015. EPA inspected the Playa Ponce facility on October 21, 2008,

March 29-30, 2011, and June 3, 2015. EPA inspected the Hormigueros Facility on October 23, 2008, March 30, 2011, and June 2, 2015.

55.     **EPA Information Requests**. EPA issued three requests for information to Homeca regarding its facilities on July 9, 2008, December 31, 2008 and February 13, 2009. Homeca responded to EPA's information requests on August 15, 2008, October 30, 2008, January 30, 2009, February 20, 2009, and March 20, 2009.

56.     The allegations in this complaint are based on EPA's inspectors' observations, results of sampling and testing from the 2011 inspections, and Homeca's responses to EPA's information requests. All of the allegations relate to the time periods covered by the inspections and by Homeca's responses.

### RCRA Violations at the Facilities

57.     At each facility, Homeca generally did not remove automobile fluids, such as gasoline, diesel, motor oil, transmission fluid, brake fluid, and coolants, before crushing the vehicles. As a result, automobile fluids leaked from the vehicles being crushed. Automobile fluids also leaked from the crushed vehicles during the bailing and storage processes. Since these processes were conducted on the bare ground, the automobile fluids dripped onto the bare ground, formed puddles on the ground and penetrated into the soil.

58.     At each facility, Homeca generally did not remove parts that could contain hazardous wastes, including mercury switches, lead wheel weights, lead battery cable ends, fuel filters, oil filters, and airbag cartridges containing sodium azide, before crushing the vehicles. As a result, there was a risk of release of these hazardous wastes during the crushing process.

59.     At each facility, Homeca generally did not clean up the puddles that contained automobile fluids or the soils that had absorbed the automobile fluids.

60.    At each facility, Homeca accumulated materials, including soils contaminated with automobile fluids and fluid-soaked rags, in drums. Homeca did not test these materials before disposal to determine whether they comprised hazardous wastes. Homeca arranged for the disposal of these materials as non-hazardous wastes in the local municipal landfill.

61.    At the Hormigueros and Playa Ponce facilities, Homeca stored used oil in tanks, drums and other containers. Homeca did not label the containers as "used oil." Homeca also did not maintain covers on some of these containers.

62.    At the Hormigueros facility, Homeca stored used lead acid batteries outdoors on a wooden pallet which itself was on bare ground. Used lead acid batteries, including the acid and lead contained therein, are hazardous wastes. This created a risk, through exposure to the elements, of a release of hazardous wastes to the soil.

63.    At the Playa Ponce facility, Homeca stored piles of scrap tires haphazardly beside the crusher, an area where there had been releases of used oil and gasoline. This created a risk of a tire fire.

64.    At each of the facilities, during relevant times, Homeca did not implement any storm water controls.

### CWA Violations – Caguas Facility

65.    The Caguas facility is located 59 feet from the Rio Grande de Loiza. The Rio Grande de Loiza is a "navigable water" and a "water of the United States."

66.    Based on available rainfall data, during the relevant time period, numerous rain events in excess of 0.5 inches of rain occurred at the Caguas facility.

67.    During these events, storm water falling at the Caguas facility flowed from the facility via a ditch and overland into the Rio Grande Loiza.

12

68. Until December 2008, Homeca had no NPDES permit authorizing the discharge of storm water associated with industrial activity at the Caguas facility.

69. On October 30, 2008, Homeca submitted an NOI for coverage under the 2008 MSGP at the Caguas facility. Coverage became effective on December 29, 2008.

70. The 2008 MSGP requires owners and operators covered by the MSGP to generate, maintain and make available for inspection reports regarding their storm water management implementation and compliance with the 2008 MSGP.

71. At the March 2011 inspection, Homeca was unable to produce any of the reports or records required under the 2008 MSGP.

72. Homeca later provided EPA with some of the reports and records regarding its compliance with the 2008 MSGP, but much of the required documentation was either missing or deficient.

**CWA Violations -- Playa Ponce Facility**

73. The Playa Ponce facility is located 42 feet from the Caribbean Sea. The Caribbean Sea is a "navigable water" and a "water of the United States."

74. Based on available rainfall data, during the relevant time period, numerous rain events in excess of 0.5 inches of rain occurred at the Playa Ponce facility.

75. During these events, storm water falling at the Playa Ponce facility flowed from the facility via a ditch and overland into the Caribbean Sea.

76. Until May 2009, Homeca had no NPDES permit authorizing the discharge of storm water associated with industrial activity at the Playa Ponce facility.

77. Homeca submitted an NOI for coverage under the 2008 MSGP for the Playa Ponce facility on March 23, 2009. Coverage became effective on May 22, 2009.

**CAA Violations at the Facilities**

78.     Homeca received at each of its three facilities vehicles that had MVACs.

79.     When it received such vehicles, Homeca did not obtain written statements from the customers delivering such vehicles verifying that the refrigerants had been recovered from vehicles prior to delivery to Homeca, and Homeca also did not perform any on-site recovery of refrigerants from such vehicles.

80.     Homeca did not maintain at any of its facilities copies of any written statements verifying, for vehicles received by Homeca that had MVACs, that all refrigerants had been recovered from the vehicles prior to delivery.

**FIRST CLAIM FOR RELIEF**
**RCRA -- Failure to Make Hazardous Waste Determinations**

81.     Paragraphs 1 through 80 are realleged and incorporated herein.

82.     A person who generates "solid waste" as defined in 40 C.F.R. § 261.2 must determine if the solid waste is a hazardous waste. 40 C.F.R. § 262.11.

83.     Materials are solid wastes if they are "abandoned by being disposed of … or accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of …" 40 C.F.R. § 261.2(b)(3).

84.     In the course of crushing and storing vehicles at its facilities, Homeca generated gasoline, diesel, used oil (motor oil, transmission fluid, and brake fluid), windshield washer fluid, and coolants.

85.     These automobile fluids leaked or were spilled onto the bare ground at each of the Homeca facilities.

14

86.     These automobile fluids were "abandoned" within the meaning of 40 C.F.R. § 261.2(b) at the Homeca facilities, and therefore constitute "solid wastes" as defined under 40 C.F.R. § 261.2.

87.     Homeca made no determinations as to whether any of the solid wastes identified in Paragraph 84 constituted hazardous wastes.

88.     Each failure by Homeca to determine if any of the solid wastes identified in Paragraph 84 constituted hazardous wastes is a violation of 40 C.F.R. § 262.11, for which Homeca is liable for civil penalties.

## SECOND CLAIM FOR RELIEF
### RCRA -- Unpermitted Disposal of Hazardous Wastes

89.     Paragraphs 1 through 88 are realleged and incorporated herein.

90.     Section 3005 of RCRA, 42 U.S.C. § 6925 and 40 C.F.R. § 270.1(c), prohibits an owner or operator from disposing of hazardous wastes at its facility without having obtained a permit or interim status authorizing such disposal.

91.     Each Homeca scrap metal recycling facility is a "facility" within the meaning of 40 C.F.R. § 260.10 because hazardous waste is or was treated, stored, or disposed of there.

92.     "Disposal" is defined in 40 C.F.R. § 260.10 as the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or onto any land so that such solid waste or hazardous waste or constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters."

93.     Homeca released mercury switches, lead wheel weights, lead battery cable ends, fuel filters, airbag cartridges containing sodium azide, gasoline, diesel, used oil (motor oil, transmission fluid, and brake fluid), windshield washer fluid, and coolants directly onto the bare ground at each of its facilities.

15

94. The automobile components and fluids released at the Homeca facilities by Homeca are "solid wastes," as defined in 40 C.F.R. § 261.2.

95. Under 40 C.F.R. § 261.3, any solid waste which exhibits any characteristic identified in Subpart C of 40 C.F.R. Part 261, such as ignitability, reactivity, or toxicity, constitutes a hazardous waste.

96. Mercury switches are toxic for mercury (D009) as that characteristic is defined in 40 C.F.R. § 261.24.

97. Lead wheel weights and lead cable ends are toxic for lead (D008), as that characteristic is defined in 40 C.F.R. § 261.24.

98. Airbag cartridges containing sodium azide are hazardous for reactivity, as that characteristic is defined in 40 C.F.R. § 261.23.

99. Fuel filters are ignitable and may be toxic for benzene, as those characteristics are defined in 40 C.F.R. § 261.21 and 40 C.F.R. § 261.24, respectively.

100. Gasoline and diesel are ignitable, and gasoline is toxic for benzene, as those characteristics are defined in 40 C.F.R. § 261.21 and 40 C.F.R. § 261.24, respectively.

101. The used antifreeze and other coolants were contaminated with, and toxic for benzene, trichloroethylene, perchloroethylene, cadmium, mercury and/or lead as those characteristics are defined in 40 C.F.R. § 261.24.

102. The mercury switches, lead wheel weights, lead battery cable ends, fuel filters, airbag cartridges containing sodium azide, gasoline, diesel, and coolants disposed of at the Homeca facilities were all hazardous wastes as defined in 40 C.F.R. §§ 261.21, 261.23 and 261.24.

103.    Homeca never obtained interim status or a permit authorizing the disposal of hazardous wastes for its facilities.

104.    Each disposal of hazardous wastes at each Homeca facility is a violation of Section 3005 of RCRA, 42 U.S.C. § 6925, and 40 C.F.R. § 270.1, for which Homeca is subject to civil penalties.

**THIRD CLAIM FOR RELIEF**
**RCRA -- Failure to Minimize Risk**

105.    Paragraphs 1 through 104 are realleged and incorporated herein.

106.    Each Homeca scrap metal recycling facility is a "facility" within the meaning of 40 C.F.R. § 260.10 because hazardous wastes are or were treated, stored, or disposed of there.

107.    Owners and operators of facilities must maintain their facilities to "minimize the possibility of a fire, explosion or any unplanned sudden or non-sudden release of hazardous waste or hazardous waste constituents to air, soil, or surface water which could threaten human health or the environment." 40 C.F.R. § 264.31.

108.    During relevant times, Homeca conducted operations at each Homeca facility in a manner that could threaten human health and the environment by failing to minimize the possibility of fire, explosion, and the release of hazardous waste and hazardous waste constituents to air, soil, or surface water. Specifically, Homeca:

    a.    Failed to remove automobile fluids and parts that contained hazardous wastes prior to crushing and storing vehicles creating a risk that hazardous wastes would be released into the environment from the crushed vehicles;

    b.    Crushed and stored vehicles on the bare ground rather than on a non-porous surface, creating a risk that fluids containing hazardous wastes could be released directly to the environment;

    c.    Failed to have collection systems to manage storm water run-off at the Caguas and Playa Ponce facilities, creating a risk that storm water that had combined with hazardous wastes from the soils at these facilities could

17

spread to and contaminate areas beyond the facilities;

d.  Failed to safely store lead acid batteries at the Hormigueros facility, creating a risk that hazardous wastes in the batteries could be released into the environment;

e.  Stored used oil in unlabeled containers, in open containers, in containers that were unsuitable for the storage of used oil, and in areas that were unsuitable for the storage of used oil, creating a risk that hazardous wastes could be released into the environment;

f.  At the Playa Ponce facility, stored piles of scrap tires haphazardly beside the crusher – an area where there had been releases of used oil and fuel – creating a risk of tire fires and releases to the environment of smoke, ash, and pyrolytic oil, which themselves are hazardous.

109.  Each failure by Homeca to maintain or operate each of its facilities in a manner minimizing the possibility of a fire, explosion or release of hazardous waste or hazardous waste constituents to air, soil, or surface water is a violation of 40 C.F.R. § 265.31 for which Homeca is subject to civil penalties.

**FOURTH CLAIM FOR RELIEF**
**RCRA -- Improper Disposal of Used Oil**

110.  Paragraphs 1 through 109 are realleged and incorporated herein.

111.  "Used oil" is "any oil that has been refined from crude oil, or any synthetic oil, that has been used and as a result of such use is contaminated by physical or chemical impurities." 40 C.F.R. § 279.1.

112.  Subpart I of 40 C.F.R. Part 279 sets forth the standards for the disposal of used oil that is not being recycled and is being disposed. Under 40 C.F.R. § 279.81, used oils that are not recycled and are identified as hazardous waste must be managed and/or disposed of in accordance with hazardous waste requirements set forth in 40 C.F.R. Parts 260-266, 268 and 270. Under 40 C.F.R. § 279.81(b), used oils that do not constitute hazardous waste must be disposed under the requirements of 40 C.F.R. Parts 257 and 258.

18

113.   Homeca received vehicles containing used oil as defined in 40 C.F.R. § 279.1.

114.   Homeca often did not remove all used oil from each vehicle before it crushed the vehicle. As a result, when Homeca crushed a vehicle, used oil often leaked from the vehicle onto the bare ground beneath the crusher.

115.   Each instance when Homeca disposed of used oil at each facility without a permit authorizing such disposal, or otherwise in accordance with 40 C.F.R. Parts 257, 258, 260-266, 268, and 270, is a violation of 40 C.F.R. § 279.81 for which Homeca is subject to civil penalties.

**FIFTH CLAIM FOR RELIEF**
**RCRA -- Improper Storage of Used Oil**

116.   Paragraphs 1 through 115 are realleged and incorporated herein.

117.   A "used oil generator" is "any person, by site, whose act or process produces used oil or whose act first causes used oil to become subject to regulation." 40 C.F.R. § 279.1. Used oil generators are subject to Subpart C of 40 C.F.R. Part 279 ("Standards for Used Oil Generators").

118.   A used oil generator must store used oil in containers clearly marked with the words "Used Oil." 40 C.F.R. § 279.22(c).

119.   Homeca collected and accumulated used oil at each of its facilities. Homeca is a "used oil generator" as that term is defined in 40 C.F.R. § 279.1 and is subject to the requirements for used oil generators set forth in Subpart C of 40 C.F.R Part 279.

120.   At the Hormigueros facility Homeca stored used oil in an improperly-marked 500-gallon tank. At the Playa Ponce facility, Homeca stored used oil: (a) in unlabeled containers in the maintenance shed and in a secondary containment area; (b) in an unlabeled drum; (c) in an unlabeled cut-off bottom section of a drum on bare ground; and (d) in an unlabeled 500-gallon steel tank.

121.    Each failure by Homeca to clearly mark each container in which it stored used oil with the words "Used Oil" is a violation of 40 C.F.R. § 279.22(c) for which Homeca is subject to civil penalties.

## SIXTH CLAIM FOR RELIEF
### RCRA -- Failure to Remediate Releases of Used Oil

122.    Paragraphs 1 through 121 are realleged and incorporated herein.

123.    Used oil generators are required to respond to releases of used oil. Upon the detection of a release of used oil to the environment, other than releases from an underground storage tank system, a used oil generator must: (a) stop the release; (b) contain the released used oil; and (c) clean up and properly manage the released used oil and other materials such as contaminated soil. 40 C.F.R. § 279.22(d).

124.    Homeca is a used oil generator as defined by 40 C.F.R. § 279.1 and is required to respond to releases of used oil in accordance with 40 C.F.R. § 279.22(d).

125.    Homeca's crushing and storage operations often released used oil at each facility, which left the soils at each facility visibly stained with used oil. Homeca did not clean up these releases of used oil.

126.    Each failure by Homeca to clean up and/or properly manage released used oil or soils that were contaminated with used oil at each Homeca facility is a violation of 40 C.F.R. § 279.22(d)(3) for which Homeca is subject to civil penalties.

## SEVENTH CLAIM FOR RELIEF
### Unauthorized Discharges of Storm Water

127.    Paragraphs 1 through 126 are realleged and incorporated herein.

128. During a number of storm events since July 1, 2005, including storm events at which more than 0.5 inches of rain fell, Homeca discharged storm water associated with industrial activity into waters of the United States from the Caguas facility without a permit.

129. Homeca did not obtain coverage under the 2008 MSGP for the Caguas facility, authorizing it to discharge storm water associated with industrial activity, until December 29, 2008.

130. During the storm events referred to in Paragraph 128, Homeca discharged storm water associated with industrial activity into waters of the United States from the Playa Ponce facility.

131. Homeca did not obtain coverage under the 2008 MSGP for the Playa Ponce facility, authorizing it to discharge storm water associated with industrial activity, until May 22, 2009.

132. All discharges of storm water associated with industrial activity from the Caguas and Playa Ponce facilities are discharges of pollutants within the meaning of Section 502(12) of the CWA, 33 U.S.C. § 1362(12).

133. Each discharge of storm water from the Caguas facility from July 1, 2005 until December 29, 2008 and each discharge of storm water from the Playa Ponce facility from July 1, 2005 until May 22, 2009 is a violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for which Homeca is liable for civil penalties.

### EIGHTH CLAIM FOR RELIEF
### 2008 MSGP Violations

134. Paragraphs 1 through 133 are realleged and incorporated herein.

135. Homeca became subject to the 2008 MSGP at the Caguas facility on December 29, 2008, and at the Playa Ponce facility on May 22, 2009.

21

136.   Part 5.4 of the 2008 MSGP requires facilities subject to the MSGP to maintain onsite inspection and monitoring records.

137.   Part 4.2.2 of the 2008 MSGP requires facilities subject to the MSGP to document and maintain onsite records of quarterly visual assessments of stormwater samples.

138.   Part 6.2 of the 2008 MSGP requires facilities subject to the MSGP to perform quarterly benchmark monitoring.

139.   Part 4.3.1 of the 2008 MSGP requires facilities subject to the MSGP to perform annual comprehensive site inspections.

140.   Part 4.3.2 of the 2008 MSGP requires facilities subject to the MSGP to keep records of annual comprehensive site inspections.

141.   Part 7.2 of the 2008 MSGP requires facilities subject to the MSGP to submit to EPA in an annual report the comprehensive site inspection records.

142.   Part 5.1 of the 2008 MSGP requires facilities subject to the MSGP to prepare a Storm Water Pollution Prevention Plan ("SWPPP") that contains all of the elements identified in Parts 5.1.1 – 5.1.7 of the 2008 MSGP.

143.   With regard to its Caguas facility, Homeca: (a) stored its inspection and monitoring records offsite; (b) kept no records of quarterly visual assessments of stormwater samples from the first quarter of 2009 to March 2011; (c) failed to properly perform quarterly benchmark monitoring for the second, third and fourth quarters of 2009; (d) failed to keep records of annual comprehensive site inspections for the fiscal years ending September 29, 2009 and September 29, 2010; (e) failed to submit to EPA in an annual report the comprehensive site inspection records for the fiscal years ending September 2009 and September 2010; and (f) failed to prepare a complete SWPPP.

144.    With regard to its Playa Ponce facility, Homeca: (a) stored its inspection and monitoring records offsite; (b) kept no records of quarterly visual assessments of stormwater samples from the third quarter of 2009 to March 2011; (c) failed to properly perform quarterly benchmark monitoring for the third quarter of 2009; (d) failed to perform comprehensive site inspections for the fiscal years ending September 2009 and the September 2010; (e) failed to keep records of annual comprehensive site inspections for the fiscal years ending September 2009 and September 2010; (f) failed to submit to EPA in an annual report the comprehensive site inspection records for the fiscal years ending September 2009 and September 2010; and (g) failed to prepare a complete SWPPP.

145.    The average of Homeca's four consecutive benchmark sampling results for October 2009, January 2010, April 2010 and August 2010 demonstrated benchmark exceedances for certain parameters.

146.    Pursuant to Part 6.2.1.2 and Part 3.2 of the 2008 MSGP, the exceedances triggered the requirement for Homeca to review the selection, design, installation, and implementation of its control measures and determine whether or not modifications are necessary.

147.    Homeca failed to perform such a review or implement any modifications as required by Part 6.2.1.2 and Part 3.2 of the 2008 MSGP.

148.    Homeca also failed to document its rationale for not taking action and failed to notify EPA of its determination in the following benchmark monitoring report pursuant to Part 6.2.1.2 of the 2008 MSGP.

149.    Each failure by Homeca: (a) to store its inspection and monitoring records offsite; (b) to maintain records of quarterly visual assessments of stormwater samples onsite; (c) to

perform quarterly benchmark monitoring; (d) to perform comprehensive site inspections; (e) to keep records of annual comprehensive site inspections; (f) to submit to EPA in an annual report the comprehensive site inspection records; and (g) to prepare a complete SWPPP is a violation of the 2008 MSGP and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for which Homeca is liable for civil penalties.

**NINTH CLAIM FOR RELIEF**
**CAA -- Failure to Verify Recovery of or Recover Refrigerants**

150. Paragraphs 1 through 149 are realleged and incorporated herein.

151. Persons who take the "final step" in the disposal process of MVACs must verify that Class I and II substances have been previously evacuated from those MVACs or must recover any Class I and II substances above *de minimis* amounts from those MVACs. 40 C.F.R. § 82.156(f).

152. At its facilities, Homeca takes the final step, within the meaning of 40 C.F.R. § 82.156(f), in the disposal process of MVACs.

153. Homeca received at each of its facilities vehicles that had MVACs.

154. At each of its facilities Homeca received vehicles with MVACs, but did not obtain proper verification statements from the customers delivering such vehicles, and did not perform any on-site recovery of refrigerants from such vehicles.

155. Each occasion on which Homeca received a vehicle that had an MVAC, and failed to either obtain proper verification statements from the customer delivering the vehicle or to perform on-site recovery of refrigerants from the vehicle, is a violation of 40 C.F.R. § 82.156(f) and Section 608 of the CAA, 42 U.S.C. § 7671g, for which Homeca is liable for civil penalties.

24

**TENTH CLAIM FOR RELIEF**
**CAA -- Failure to Maintain Records of Verification Statements**

156.    Paragraphs 1 through 155 are realleged and incorporated herein.

157.    Each person disposing of MVACs must keep copies of signed statements obtained for purposes of satisfying 40 C.F.R. § 82.156(f) and maintain them on-site for a period of three years. 40 C.F.R. § 82.166.

158.    Homeca disposed of MVACs at each of its facilities.

159.    Homeca failed to maintain records of any verification statements at each of its facilities.

160.    Each failure by Homeca to maintain records of verification statements is a violation of 40 C.F.R. § 82.166 and Section 608 of the CAA, 42 U.S.C. § 7671g, for which Homeca is liable for civil penalties.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

1.    Order Homeca to pay civil penalties not to exceed $32,500 per day for each violation of the RCRA, CWA and CAA that occurred on or before January 12, 2009, and $37,500 per day for each violation of the RCRA, CWA and CAA that occurred after January 12, 2009 at the Homeca facilities;

2.    Award the United States all costs and disbursements of this action; and

3.    Grant such other relief as the Court deems just and proper.

25

Respectfully submitted,

**For the United States of America:**

ELLEN M. MAHAN
Deputy Section Chief
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section


_5/11/17_                                      _/s/ Mark Gallagher_
Dated                                         MARK A. GALLAGHER
                                              Senior Attorney
                                              United States Department of Justice
                                              Environment and Natural Resources Division
                                              Environmental Enforcement Section
                                              Washington, DC 20044-7611
                                              Tel.: 202-514-5405
                                              mark.gallagher@usdoj.gov

                                              ROSA E. RODRIGUEZ-VELEZ
                                              United States Attorney
                                              District of Puerto Rico

                                              CARMEN MARQUEZ
                                              Assistant United States Attorney
                                              District of Puerto Rico
                                              Torre Chardon, Suite 1201
                                              350 Carlos Chardón Avenue
                                              San Juan, PR 00918

Of Counsel:

MELVA J. HAYDEN
EVANS STAMATAKY
JEANNIE M. YU
Assistant Regional Counsels
U.S. EPA, Region II
Office of Regional Counsel
290 Broadway, 16th Floor
New York, NY  10007-1866

26